UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

IB AGRICULTURE, INC.                                                             PLAINTIFF

v.                                                            CIVIL ACTION NO. 3:12-CV-00271-CRS

MONTY'S PLANT FOOD CO.                                                           DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court on Defendant Monty's Plant Food Co.'s ("Monty's") Motion for Summary Judgment (DN 50). For the following reasons, the Court will grant summary judgment in favor of Monty's.

### I.     BACKGROUND

This case arose from a manufacturer-distributor relationship between Monty's and Plaintiff IB Agriculture, Inc. ("IB Ag"). Monty's manufactures a variety of agricultural products designed for plant and soil enhancement. Those products are available to customers through Monty's network of regional distributors.

In 2004, Eric Ibey, who later formed and controlled IB Ag, began to deal in Monty's products. (Voss Dep., DN 50-7, at 6). Ibey's first interactions with Monty's occurred when he assisted a Monty's distributor in developing markets in the Pacific Northwest. (Voss Dep., DN 50-7, at 6). In 2006, Monty's relationship with that distributor terminated, and Ibey began to pursue his own exclusive distributorship for that region. (Voss Dep., DN 50-8, at 7). But Monty's was not satisfied that Ibey then possessed the necessary resources to become a distributor. (Voss Dep., DN 50-8, at 7). Instead, Ibey started working as an independent sales

representative for Monty's and received pay on a commission basis. (Voss Dep., DN 50-9, at 7–8).

In late 2006, Ibey again urged Monty's to appoint him as an exclusive distributorship. (Voss Dep., DN 50-12, at 9–10). On December 31, 2006, Ibey voluntarily resigned his position as an independent sales representative. (Ibey Letter, Dec. 12, 2006, DN 50-13). He recruited several business partners and submitted a written proposal for the distributorship to Monty's. (IB Ag Proposal, DN 14, at 1); (Voss Dep., DN 50-15, at 14–15). IB Ag, a corporation led by Ibey, would operate this proposed distributorship. (IB Ag Proposal, DN 14).

On February 12, 2007, Monty's and IB Ag executed the Summary Agreement to Enter into an Exclusive Master Distributorship Agreement Between Monty's Plant Food Company, Inc. and IB Agriculture, Inc. ("Summary Agreement"). (Summ. Agreement, DN 50-2, at 1, 5). The Summary Agreement was the only written instrument the parties created to govern their commercial relationship. (Def.'s Mot. for Summ. J., DN 50, at 6); (Pl.'s Resp. to Def.'s Mot. for Summ. J., DN 51, at 2).

Shortly after IB Ag's distributorship started, conflicts arose between the parties. Those conflicts involved a variety of subjects, including (1) Monty's ability to conduct direct sales in IB Ag's territory, (Ibey Dep., DN 50-22, at 102–03); (2) Monty's control over sales to major accounts, (Ibey Dep., DN 51-1, at 101, 110–11); (3) increases in Monty's distributor prices, (Ibey Dep., DN 51-1, at 88–89); (4) IB Ag's deviations from Monty's nationwide price guidelines, (Voss Dep., DN 50-23, at 28–30); (Voss Dep., DN 50-26, at 30–32); and (5) misrepresentations concerning Monty's products, (Ibey Dep., DN 51-1, at 116–19). In this case, IB Ag's claims derive from those conflicts, and the Court will discuss them in greater detail as it analyzes each claim.

After several years, the ties between the parties became too strained for their affiliation to survive. On October 10, 2010, Monty's terminated its commercial relationship with IB Ag, prohibiting IB Ag from selling Monty's products as a distributor. (Voss Dep., DN 50-32, at 38–40); (Stephens Email, Feb. 1, 2010, DN 50-33).

On January 25, 2012, IB Ag filed this lawsuit in Montana state court. (Compl., DN 2). In its Complaint (DN 2), IB Ag alleges seven claims against Monty's: breach of contract (Count I), actual fraud (Count II), constructive fraud (Count III), negligence (Count IV), negligent misrepresentation (Count V), tortious interference with a prospective business advantage (Count VI), and malice (Count VII).

On March 21, 2012, Monty's removed the case from state court to the United States District Court for the District of Montana, basing subject matter jurisdiction solely on diversity of citizenship. (Notice of Removal, DN 1). On May 22, 2012, that federal court determined that the Summary Agreement's forum-selection clause made venue improper in the District of Montana, and it transferred the case to the chosen forum—the Western District of Kentucky. (Order, May 22, 2012, DN 12).

On July 11, 2013, IB Ag filed a petition for bankruptcy in the District of Montana. (Notice of Bankruptcy Filing and Mot. to Stay Proceedings, DN 44). In response, this Court stayed its proceedings until relief from the automatic stay could be obtained. (Order, Oct. 17, 2013, DN 46). On November 4, 2013, the Court lifted the stay on these proceedings, and litigation activities resumed. (Order, Nov. 4, 2013, DN 48). Monty's now calls upon this Court to grant summary judgment in its favor on all of IB Ag's claims.

## II.	STANDARD

The Court shall grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of explaining the basis of its motion and demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). That burden may be satisfied only by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the . . . presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Should the movant meet its burden, the nonmoving party may not simply rest on its prior pleadings; it must produce further evidence showing a genuine issue for trial. *Celotex*, 477 U.S. at 324.

When considering a motion for summary judgment, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). Even so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient . . . ." *Id.* at 252.

## III. DISCUSSION

### A. Count I—Breach of Contract

Count I alleges that Monty's breached the parties' distributorship agreement by conducting direct sales in IB Ag's territory and raising the prices of its products. (Compl., DN 2, Ct. I). To prevail on a breach of contract claim, the plaintiff must establish (1) the existence of a contract, (2) breach of that contract, and (3) damages resulting from the breach. *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009); *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007). The parties do not dispute that a contract existed or that the Summary Agreement expresses its terms. (Def.'s Mot. for Summ. J., DN 50, at 6); (Pl.'s Resp. to Def.'s Mot. for Summ. J., DN 51, at 2). The critical issue for Count I is whether Monty's breached the contract.

To resolve the breach claim, the Court must ascertain what obligations the contract imposed. The construction and interpretation of a contract is a matter of law for the court to decide. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003) (citing *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. App. 2000)). The proper method of construction and interpretation depends on the governing body of law—the common law of contracts or Article 2 of the Uniform Commercial Code ("UCC"), KRS Chapter 355.[1] If the distributorship agreement does not fall within the scope of Article 2 of the UCC, the common law will control.

Article 2 of the UCC applies to "transactions in goods," including any mixed contract for goods and services in which the sale of goods predominates. KRS 355.2-102; *MidAmerican Distribution, Inc. v. Clarification Tech., Inc.*, 807 F. Supp. 2d 646, 665–66 (E.D. Ky. 2011);

---

[1] Both parties failed to clarify whether the common law or Article 2 of the UCC controls in this dispute. While IB Ag made vague references to course of performance—a UCC concept—those reference lacked any citation to the statute. (Pl.'s Resp. to Def.'s Mot. for Summ. J., DN 51, at 3).

*Marley Cooling Tower Co. v. Caldwell Energy & Envtl., Inc.*, 280 F. Supp. 2d 651, 659 (W.D. Ky. 2003). The distributorship agreement between IB Ag and Monty's was a mixed contract. The distributorship obligated IB Ag to purchase Monty's products but also required IB Ag to market and promote those products and provide direct customer service. (Summ. Agreement, DN 50-2, at 3). Therefore, the Court must decide whether the sale of goods predominated over the sale of services by "look[ing] to the real nature of the agreement between the parties, what its real purpose was, and what, from the nature of the transaction, must have been in the minds of the parties." *Buttorff v. United Elec. Labs., Inc.*, 459 S.W.2d 581, 585 (Ky. 1970).

Courts most often classify typical distributorship agreements as contracts for the sale of goods. *See Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 612 (6th 2001) ("The majority rule is that distributorship contracts are sales contracts. . . . One can imagine a distributorship agreement in which the service component predominates over the goods component, but in the typical case, . . . the service component will not predominate . . . ."). In *Leibel v. Raynor Manufacturing Co.*, the court classified a distributorship agreement as a contract for the sale of goods because the distributor purchased and received products from the manufacturer and then resold those products directly to the customers. 571 S.W.2d 640, 641–43 (Ky. App. 1978); *see also Pharo Distrib. Co. v. Stahl*, 782 S.W.2d 635, 637–38 (Ky. App. 1989). But, where the distributor's role is more properly characterized as commissioned sales representative, the distributorship agreement is a services contract. *See MidAmerican*, 807 F. Supp. 2d at 665–66 (holding that a distributorship agreement was a services contract because the distributor could neither enter into bilateral contracts with customers nor control its sales volume or profit margin); *Buttorff*, 459 S.W.2d at 583–85 (holding that a distributorship agreement was a

services contract because the distributor merely solicited orders to be placed with and shipped from the manufacturer without obtaining title to the products for itself).

Here, the distributorship closely resembles the facts of *Leibel* and presents no significant indicia of a commission-based relationship. Under the Summary Agreement, IB Ag was responsible for "purchasing, receiving and paying for the minimum volume of Products" as specified for each year. (Summ. Agreement, DN 50-2, at 2). IB Ag bought Monty's products at special distributor prices, paying fifty percent of the purchase price at the time it placed each order and the remainder fifteen days after shipment. (Summ. Agreement, DN 50-2, at 1, 3). Unless special circumstances necessitated intervention, Monty's refrained from direct dealings with customers in territories where a distributor operated. (Voss Dep., DN 50-51, at 40–41). Thus, IB Ag purchased and took possession of the manufacturer's products and then resold those products directly to customers. Though the Summary Agreement required IB Ag to perform certain services, such as marketing, promotion, and customer service, those services merely supplemented and did not predominate over the sale-of-goods portion of the contract. (Summ. Agreement, DN 50-2, at 3). Therefore, the Court concludes that the distributorship agreement between Monty's and IB Ag was a contract for the sale of goods governed by Article 2 of the UCC.

Under Article 2 of the UCC, the terms of a written agreement may be "explained or supplemented" by course of performance, course of dealings, and usage of trade. KRS 355.2-202(1). Whenever reasonable, the express terms of an agreement shall be construed as consistent with any applicable course of performance, course of dealing, or usage of trade. KRS 355.1-303(5); *Savannah Sugar Refinery v. RC Can. Dry Bottling Co.*, 593 S.W.2d 880, 884 (Ky. App. 1979). But, if consistent construction is unreasonable, the express terms prevail over such

extrinsic evidence. KRS 355.1-303(5)(a); *Catron v. Citizens Union Bank*, 229 S.W.3d 54, 57 (Ky. App. 2006); *Savannah Sugar*, 593 S.W.2d at 884.

The Court will now examine the express terms of the Summary Agreement. The stated purpose of the document was that "the parties shall work together to reach an agreement to appoint IB Ag . . . as the Exclusive Agriculture Distributor for Monty's Products . . . in the Region," which covered Idaho, Montana, Oregon, Washington, Wyoming, and Utah. (Summ. Agreement, DN 50-2, at 1). Becoming the Exclusive Agriculture Distributor meant that Monty's would not appoint another agriculture distributor to sell its products in that same territory. (Summ. Agreement, DN 50-2, at 1). Still, the Summary Agreement required IB Ag to undergo a trial period "on a non-exclusive basis" from February 12 to May 1, 2007. (Summ. Agreement, DN 50-2, at 1). During that trial period, IB Ag was obligated to fulfill the following seven requirements:

- IB Ag will coordinate sales presentations within the territory to include JR Simplot, Western Farm Service and Wilbur-Ellis with Monty's participation.
- IB Ag will hire, or contract, 2 full time field sales personnel to focus on building Monty's sales and field service for farm operations, distributors and dealers.
- Identification of and agreement signed by IB Ag to locate its offices and initial warehouse, planned in Montana.
- IB Ag to purchase a minimum of $300,000 in Product from Monty's with payment based on 50% paid at order placement and the remaining 50% paid with 15 days from shipment. Minimum orders totaling $300,000 must be placed by IB Ag to Monty's by April 10, 2007, and shipped within 5 days of Monty's having the order ready to ship.
- IB Ag to have the necessary licenses and to comply with all necessary legal requirements to sell the Products in the Region.
- IB Ag to provide a more detailed sales and marketing plan on how the $800,000 sales minimum will be achieved in 2007.
- The parties agree to and sign a Distribution Agreement.

(Summ. Agreement, DN 50-2, at 1). If IB Ag completed all seven requirements by May 1, 2007, Monty's would appoint it as the Exclusive Agriculture Distributor. (Summ. Agreement, DN 50-

2, at 1). However, the Summary Agreement also provided that, "[t]o the extent all of the above requirements are not satisfied by May 1, 2007, this document will terminate." (Summ. Agreement, DN 50-2, at 1).

Though IB Ag admits that it failed to complete the seven requirements by May 1, 2007, (Ibey Dep., DN 50-20, at 65), it argues that Monty's breached prior to the contract's termination by conducting direct sales and raising prices.[2] First, IB Ag asserts that the parties' course of performance evidences an exclusive distributorship because it served as Monty's only distributor in the sales region for the relevant time period. In essence, IB Ag asks this Court to construe the word "non-exclusive" to mean exclusive based on the course of performance. Such a construction is clearly unreasonable. A course of performance is admissible to explain or supplement the express terms of an agreement, KRS 355.2-202(1), but IB Ag's suggested construction is a total contradiction of the express terms. Therefore, the express terms must control. IB Ag held only a non-exclusive distributorship because it failed to complete the trial period's seven requirements.

Second, IB Ag argues that Monty's breached by interfering with its potential sale to JR Simplot. IB Ag relies on the trial period requirement that "IB Ag will coordinate sales presentations within the territory to include JR Simplot, Western Farm Service and Wilbur-Ellis with Monty's participation." (Summ. Agreement, DN 50-2, at 1). IB Ag complains that Monty's prevented it from fulfilling this requirement by removing it from negotiations and finishing the sale directly. Assuming that Monty's did remove IB Ag from the sale, IB Ag misinterprets the obligations imposed by the pertinent requirement. IB Ag could have met the

---

[2] IB Ag only references a single example of Monty's direct sales in its territory—the JR Simplot sale. (Ibey Dep., DN 51-1, at 101, 110–11). But IB Ag offers no clear evidence that Monty's actually completed that sale. Nonetheless, the Court will interpret the factual uncertainty in favor of IB Ag and assume, for the purposes of summary judgment, that Monty's did finalize direct sales in IB Ag's territory.

requirement as to JR Simplot by simply coordinating the sales presentation with Monty's participation; IB Ag did not need to consummate the sale. Thus, Monty's did not breach the distributorship agreement through its alleged sale to JR Simplot.

Third, IB Ag contends that Monty's breached by raising the distributor prices. To support its argument, IB Ag cites distributor price sheets for 2007, 2008, and 2010. (Price Sheet 2007, DN 51-2); (Price Sheet 2008, DN 51-3); (Price Sheet 2010, DN 51-4). However, because it is undisputed that the Summary Agreement expresses the only distributorship contract between the parties, the price sheets for the years subsequent to 2007 are irrelevant. As discussed above, the Summary Agreement terminated when IB Ag failed to complete the trial period requirements. To be relevant, any price change must have occurred between February 12 and May 1, 2007. With only a single price sheet for 2007, IB Ag has offered no proof that a price change occurred while the distributorship contract remained in force. Additionally, the Summary Agreement permitted amendments to the distributor prices.$^3$ Therefore, the Court concludes that Monty's did not breach the parties' distributorship agreement and is entitled to summary judgment on Count I.$^4$

### B. Count II—Actual Fraud

Count II alleges that Monty's committed actual fraud by conducting direct sales in IB Ag's territory. (Compl., DN 2, Ct. II). A claim of actual fraud requires the plaintiff to prove six elements by clear and convincing evidence: "(1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to

---

$^3$ "The basis for the pricing shall be the distributor and dealer quoted sales prices presented in Monty's literature, and as subsequently amended for all distributors and dealers (attached)." (Summ. Agreement, DN 50-2, at 3).
$^4$ In its pleadings, IB Ag did not argue for a waiver of conditions or mention the duty to perform in good faith, either by name or statutory reference.

act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff." *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 548–49 (Ky. 2009).

IB Ag argues that the terms of the Summary Agreement materially misrepresented Monty's ability to conduct direct sales. Under this theory, IB Ag does not claim that it was entitled to absolute exclusivity. Rather, IB Ag asserts that "a reasonable inference can be made that, while other third parties may have continued to sell Monty's products within the region, none of those sales would be made directly by Monty's, in competition with IB Ag." (Pl.'s Resp. to Def.'s Mot. for Summ. J., DN 51, at 4). That "reasonable inference" cannot be considered a material representation made by Monty's. IB Ag's inference is conjecture with no real basis in the contract's express terms. The Summary Agreement provides that IB Ag would be a non-exclusive distributor for the trial period and that Monty's would participate in sales to large accounts, such as JR Simplot, Western Farm Service, and Wilbur-Ellis. (Summ. Agreement, DN 50-2, at 1). The Summary Agreement contains no statement that Monty's would refrain from direct sales during the trial period. IB Ag's subjective inferences alone do not suffice for clear and convincing evidence of a fraudulent misrepresentation. Therefore, the Court concludes that IB Ag's actual fraud claim fails and that Monty's is entitled to summary judgment on Count II.

### C. Count III—Constructive Fraud

Count III alleges that Monty's constructively defrauded IB Ag by selling directly to customers in IB Ag's territory. (Compl., DN 2, Ct. III). "Constructive fraud arises through some breach of a legal duty which, irrespective of moral guilt, the law would pronounce fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests."

*Wood v. Kirby*, 566 S.W.2d 751, 755 (Ky. 1978); *Kendrick v. Bailey Vault Co., Inc.*, 944 S.W.2d 147, 150 (Ky. App. 1997). The breach of a legal duty "is a necessary prerequisite for any action premised on constructive fraud." *Coomer v. Phelps*, 172 S.W.2d 389, 393 (Ky. 2005). If the plaintiff fails to produce any evidence that the defendant violated a legal duty owed, summary judgment on the constructive fraud claim is proper. *Id.*

Here, no legal duty prevented Monty's from selling directly to customers in IB Ag's territory. The Court has concluded that the distributorship contract did not obligate Monty's to refrain from such direct sales. The Summary Agreement states that IB Ag's initial distributorship was "non-exclusive," and it even provides for Monty's participation in sales to major customers. (Summ. Agreement, DN 50-2, at 1). Additionally, IB Ag did not assert that Monty's violated any other legal duties, such as a fiduciary duty or confidential relationship. Therefore, the Court concludes that IB Ag's constructive fraud claim fails and Monty's is entitled to summary judgment on Count III.

### D. Count IV—Negligence

Count IV alleges that Monty's committed negligence by failing to ensure that its products met applicable federal and state testing standards. (Compl., DN 2, Ct. IV). "A common law negligence claim requires proof of (1) a duty owed by the defendant to plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and legal causation between the defendant's breach and the plaintiff's injury." *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012) (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88–89 (Ky. 2003)).

IB Ag did not specify the relevant duty owed in its pleadings. IB Ag never mentions ordinary care or negligence per se. Rather, IB Ag argues that Monty's violated a "general duty"

to ensure that its product complied with government standards. (Pl.'s Resp. to Def.'s Mot. for Summ. J., DN 51, at 6–7).

Without knowing the specific duty, the Court may still resolve this claim because IB Ag did not offer any evidence of the alleged breach of duty. No materials in the record indicate that Monty's failed to ensure that its products complied with government standards. In fact, Ibey's sworn deposition testimony admits that Monty's product passed applicable federal and state testing. (Ibey Dep., DN 50-40, at 114–15).

IB Ag concedes that the current record does not support a breach of duty, but it blames the absence of evidence on Monty's refusal to cooperate with discovery requests. (Pl.'s Resp. to Def.'s Mot. for Summ. J., DN 51, at 6–7). Nevertheless, IB Ag maintains a passive attitude toward uncovering evidence of its negligence claim. IB Ag has taken no action to compel production or extend the time for discovery.

At this stage of the litigation, "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257. In other words, Monty's may challenge IB Ag to "put up or shut up" on this critical issue in the negligence claim. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989) (internal quotation marks omitted).

The key inquiry is whether IB Ag has had an adequate opportunity for discovery. *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231–32 (6th Cir. 1994); *see Street*, 886 F.2d at 1487. More than two years ago, on August 20, 2012, the Court approved the parties' Agreed Litigation Plan and Discovery Schedule. (Order, Aug. 20, 2012, DN 30). On June 5, 2013, the Court granted Monty's motion to extend discovery. (Order, June 5, 2013, DN 40).

Absent any request from IB Ag to compel or extend discovery, the Court concludes that IB Ag has had an adequate opportunity for discovery. Accordingly, IB Ag has failed to support its negligence claim with affirmative evidence, and Monty's is entitled to summary judgment on Count IV.

### E. Count V—Negligent Misrepresentation

In Count V, IB Ag alleges that Monty's negligently misrepresented its products as a stand-alone fertilizer, rather than a fertilizer additive. (Compl., DN 2, Ct. V). Kentucky courts adopted the tort of negligent misrepresentation as expressed in § 552 of the Restatement (Second) of Torts. *Presnell Contr. Managers, Inc. v. EH Contr., LLC*, 134 S.W.3d 575, 580–82 (Ky. 2004). Section 552 states the elements of negligent misrepresentation as follows:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss *caused to them by their justifiable reliance upon the information*, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to the loss suffered
>
>> (a) by the person of one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>>
>> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) or Torts § 552(1)–(2) (1977) (emphasis added); *Presnell*, 134 S.W.3d at 580.

To support this claim, IB Ag offers two sources of evidence. First, IB Ag cites pricing literature that describes the product as "Fertilizer Product." (Price Sheet 2007, DN 51-2); (Price

Sheet 2008, DN 51-3); (Farmer Pricing 2008, DN 51-7). Second, IB Ag refers to a meeting of farmers at which a Monty's representative portrayed the product as a stand-alone fertilizer to IB Ag's customers. (Ibey Dep., DN 51-1, at 116–19).

Assuming that the above evidence is true and accurate, IB Ag's claim for negligent misrepresentation still fails because IB Ag presents no proof that it relied on the alleged misrepresentations. During his two years as a sales representative, Ibey developed a high level of knowledge concerning Monty's products, and he carried that knowledge into IB Ag's distributorship venture. The record indicates that IB Ag recognized the asserted misrepresentations without relying on them. In fact, when the Monty's representative mischaracterized the product at the farmers' meeting, IB Ag attempted to correct the statement immediately. (Ibey Dep., DN 51-1, at 119). The Court concludes that, without a showing of reliance, IB Ag's negligent misrepresentation claim fails, and Monty's is entitled to summary judgment on Count V.

### F. Count VI—Tortious Interference with a Prospective Business Advantage

Count VI alleges that Monty's tortuously interfered with a prospective business advantage by selling directly to customers in IB Ag's territory. (Compl., DN 2, Ct. VI). The plaintiff must prove six elements to succeed on its claim of tortious interference with a prospective business advantage: (1) the existence of a valid business relationship or expectancy, (2) that the defendant was aware of this relationship or expectancy, (3) that the defendant intentionally interfered, (4) that the motive behind the interference was improper, (5) causation, and (6) special damages. *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky. App. 2012). The viability of such a claim turns on the existence of improper motive. *Id.* (citing *Nat'l Collegiate Athletic Ass'n ex rel. Bellarmine Coll. v. Hornung*, 754 S.W.2d 855, 859 (Ky.

1988)). If the defendant had a legitimate interest to protect, the presence of some spiteful influence is usually insufficient to result in liability. *Hornung*, 745 S.W.2d at 859. "[I]t is clear that to prevail a party seeking recovery must show malice or some significantly wrongful conduct." *Id.*

IB Ag's initial argument is that Monty's direct sales undermined the parties' business relationship and denied IB Ag the benefits of the distributorship. But, as discussed above, IB Ag's distributorship was non-exclusive, and Monty's did not violate the parties' contract by conducting direct sales. Moreover, accepting the view that Monty's direct sales constituted interference, evidence that intentional interference occurred does not, by itself, also establish improper motive. *See Id.*

To prove improper motive, IB Ag further argues that such motive can be inferred from Monty's involvement in the potential sale to JR Simplot. The Summary Agreement, however, provided that Monty's would participate in the sales presentations to JR Simplot and other large accounts. (Summ. Agreement, DN 50-2, at 1). Therefore, Monty's held a legitimate contractual interest in being part of any sales to JR Simplot—an interest that IB Ag knew of when it began the distributorship. Without evidence of malice or some significantly wrongful conduct, any inference of improper motive gathered from Monty's mere involvement in the JR Simplot sale is unreasonable.

Finally, IB Ag references an email that Ibey received from a purported Monty's investor, Dave McEwen, to show improper motive. (Ibey Dep., DN 51-1, at 72–75). McEwen allegedly told Ibey that IB Ag "would not be involved in the contract with Simplot, [and] that [Ibey] would somehow be benefitted later." (Ibey Dep., DN 51-1, at 72). After receiving this message, IB Ag stepped away from the Simplot deal. (Ibey Dep., DN 51-1, at 72–73). Nonetheless, the McEwen

email alone is not sufficient evidence to demonstrate malice or significantly wrongful conduct. First, Monty's may have truly intended to reward Ibey at a later date, but the parties' relationship became strained after IB Ag did not fulfill its trial period requirements. Monty's had a legitimate business interest in limiting the number of parties in a complex negotiation. Second, IB Ag shows no proof to substantiate the claim that McEwen was an agent of Monty's. Third, IB Ag did not produce a copy of the McEwen email for the Court to examine. The Court concludes that IB Ag's claim for tortious interference with a prospective business advantage fails for lack of evidence that Monty's possessed an improper motive. Accordingly, Monty's is entitled to summary judgment on Count VI.

### G. Count VII—Malice

In Count VII, IB Ag alleges that Monty's conduct constituted malice. This final claim fails for two reasons. (Compl., DN 2, Ct. VII). First, IB Ag pleaded malice under Montana law, (Compl., DN 2, Ct. VII, ¶ 61), but the Summary Agreement's choice-of-law clause requires that all claims related to the distributorship contract be resolved under Kentucky law, (Summ. Agreement, DN 50-2, at 4). Kentucky does not recognize an independent claim for malice. Second, even if IB Ag alleged malice to simply establish grounds for punitive damages, a request for punitive damages cannot succeed where, as here, the plaintiff fails to assert a claim on which actual damages can be awarded. *Ammon v. Welty*, 113 S.W.3d 185, 188 (Ky. App. 2002). Moreover, IB Ag submitted no defense of the malice claim in its responsive pleadings. (Pl.'s Resp. to Def.'s Mot. for Summ. J., DN 51). The Court concludes that the malice claim fails, and Monty's is entitled to summary judgment on Count VII.

## IV. CONCLUSION

For the reasons stated above, the Court will grant Defendant Monty's Motion for Summary Judgment (DN 50). A separate order will be entered this date in accordance with this Memorandum Opinion dismissing Counts I through VII of Plaintiff IB Ag's Complaint (DN 2) with prejudice.

September 26, 2014

**Charles R. Simpson III, Senior Judge**
**United States District Court**